**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **NASHVILLE STUDENT** | ) | |
| **ORGANIZING COMMITTEE, et al.,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **CASE NO. 3:15-cv-00210** |
| | ) | |
| **TRE HARGETT, in his official** | ) | **JUDGE ALETA A. TRAUGER** |
| **capacity as Tennessee Secretary of** | ) | **MAGISTRATE JUDGE JOHN S.** |
| **State, et al.,** | ) | **BRYANT** |
| | ) | |
| *Defendant*s. | ) | |
| | ) | |
| | ) | |

---

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

---

Plaintiffs oppose Defendants' Motion to Dismiss First Amended Complaint. Defendants' Motion to Dismiss is premised on a misreading of the Supreme Court's precedent, a misreading of Plaintiffs' First Amended Complaint ("FAC"), a misreading of the Twenty-Sixth Amendment and a misunderstanding of the distinct causes of action which may be brought under the Fourteenth Amendment.

As the FAC alleges in detail, there is no rational basis for the Tennessee General Assembly's "policy judgment" to exclude student ID cards from the list of accepted voter ID in Tenn. Code Ann. § 2-7-112. DE 43 PageID #463. The basis was to discriminate against younger voters attending college or university in Tennessee and skew electoral turnout towards older voters. There are over 30 voter ID laws in the country[1] and not one

---

[1] Ala. Code § 17-9-30; Alaska Stat. § 15.15.225; Ariz. Rev. Stat. § 16-579; Colo.

of them (except for Tennessee's) accepts some forms of college and university IDs but rejects others based on the cardholder's affiliation with a college or university. Barring one negligible exception in a non-strict voter ID law, Tennessee's voter ID law is the only one that contains an exclusionary classification.[2] Indiana's voter ID law – the purported model for Tennessee's law, which was upheld in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) – permits the use of public college and university IDs at the polls. These laws are not "virtually identical." DE 43 PageID #462.

Defendants selectively cite to the FAC and ignore factual allegations beyond those referring to the four corners of the voter ID law, such as those pertaining to the full legislative history of the statute and related laws concerning absentee voting and driver licensing, which sought to make it easier for older voters to comply with the voter ID law or avoid it entirely. Legislative decisions made in those areas exacerbated the age-discriminatory effects of the voter ID law, as revealed by a federal government study, and provide strong evidence of intentional age discrimination.

---

REV. STAT. ANN. §§ 1-1-104(19.5)(a), 1-7-110; CONN. GEN. STAT. ANN. § 9-261; DEL. CODE ANN. tit. 15, § 4937; FLA. STAT. ANN. §101.043; GA. CODE ANN. § 21-2-417; HAW. REV. STAT. § 11-136; IDAHO CODE ANN. §§ 34-1106, 34-1113, 34-1114; IND. CODE. ANN. §§ 3-5-2-40.5, 3-11-8-25.1; KAN. STAT. ANN. §§ 25-2908, 25-1122, 8-1324; KY. REV. STAT. ANN. § 117.227; 31 KY. ADMIN. REGS. 4:010 (Sept. 2015); LA. REV. STAT. ANN. § 18:562; MICH. COMP. LAWS ANN. § 168.523; MISS. CODE ANN. § 23-15-563; MO. REV. STAT. § 115.427(13); MONT. CODE ANN. § 13-13-114; N.H. REV. STAT. ANN. § 659:13; N.D. CENT. CODE § 16.1-05-07; OHIO REV. CODE ANN. § 3505.18; OKLA. STAT. ANN. tit. 26, § 7-114; R.I. GEN. LAWS § 17-19-24.2; S.C. CODE ANN. § 7-13-710; S.D. CODIFIED LAWS §§ 12-18-6.1, 6.2; TENN. CODE ANN. § 2-7-112; TEX. ELEC. CODE ANN. §§ 63.001, 63.0101; UTAH CODE ANN. §§ 20A-1-102, 20A-3-104; VA. CODE ANN. § 24.2-643; WASH. REV. CODE ANN. § 29A.40.160; WIS. STAT. §§ 5.02(6m), 6.79(2a). North Carolina's voter ID law will become effective on January 1, 2016 and, like South Carolina and Texas, it categorically excludes college and university IDs, instead of drawing lines between different college ID cardholders. N.C.G.S.A. § 163-166.13.
[2] Ohio expressly excludes "a notice of voter registration mailed by a board of elections." OHIO REV. CODE ANN. § 3505.18.

# I. THE SUPREME COURT'S DECISION IN *CRAWFORD* DOES NOT FORECLOSE THIS CASE.

There are three significant differences between this case and *Crawford*: (1) different claims; (2) different facts; and (3) different relief sought by the plaintiffs.

## A. Different Claims

Neither of the claims at issue here – a Twenty-Sixth Amendment age discrimination claim on behalf of public and private college and university students in Tennessee and a straightforward equal protection claim on behalf of public college and university students – was adjudicated in *Crawford*. To argue these claims are foreclosed is to assert that a type of law upheld against one type of constitutional challenge on a particular factual record is necessarily free of any other constitutional defects.

Defendants contend that all voting laws must be analyzed under the Supreme Court's precedent in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), *Burdick v. Takushi*, 504 U.S. 428 (1992), and *Crawford* which applied the *Anderson* balancing test, and that all voting rights claims are *Anderson/Burdick* claims, even where Plaintiffs manifestly do not state claims under *Anderson/Burdick*.[3]

The FAC does not attack the legitimacy or importance of the state's interest in preventing voter fraud. The FAC does characterize the burdens of the Department of Safety & Homeland Security's ("DS&HS") process for obtaining a nominally "free"

---

[3] *See Anderson*, 460 U.S. at 788-89; *Burdick*, 504 U.S. at 434 ("Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.") (citations and quotation marks omitted).

Case 3:15-cv-00210   Document 48   Filed 10/09/15   Page 3 of 32 PageID #: 576

Identification Only License for voting purposes but solely in contrast to those older voters who were exempted or otherwise shielded from the need to obtain a voter ID at a Driver Service Center. Crucially, the FAC nowhere alleges that the burdens imposed by the law are not justified by the state's interests. Rather, the FAC alleges Tennessee's voter ID law is discriminatory in the lines drawn between accepted forms of voter ID and student ID cards issued by public and private accredited, not-for-profit postsecondary educational institutions, not that the law is "excessively burdensome" for all ID-less voters or any particular class of voters as compared to the state's interests. *Crawford*, 553 U.S. at 202 (citation and quotation marks omitted). Plaintiffs allege that the ID law was a deliberate effort to skew the electorate towards older voters and away from younger voters, DE 36 PageID #295 ¶ 4, #303-04 ¶ 29, #322 ¶ 70, #325 ¶ 81, and have accordingly alleged intentional age discrimination in violation of the Twenty-Sixth Amendment and a denial of equal protection to public college and university students. This is not an "attempted end-run" around *Crawford*. DE 43 PageID #462. These are different claims.

### B. Different Facts

While similar in certain respects, Indiana's voter ID law differs from Tennessee's voter ID law in one crucial respect—it includes all public postsecondary educational institutions' IDs, including student IDs. *Crawford* was also adjudicated on an extremely thin factual record: "*[O]n the basis of the record that has been made in this litigation*, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters." 553 U.S. at 202 (emphasis added); *see also Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 783 (S.D. Ind. 2006) (finding petitioners had "not

introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of SEA 483"). The FAC recounts the choices the General Assembly made in crafting and amending the voter ID law, the law's extensive legislative history and directly related enactments that followed its 2012 rollout, including measures that sought to make it easier for older voters to cast a ballot without going through the DS&HS's free voter ID process, the voter ID law's interaction with other election laws which work to make it harder for newer, younger voters to cast a ballot, allegations as to the Tennessee public and private college and university ID cards, and the impact the law has had on youth turnout in the state as compared to older voters. This lays a roadmap for a very different kind of factual record than that developed in *Crawford*.

### C. Different Relief Sought by the Plaintiffs

Additionally, the facial challenge in *Crawford* sought the invalidation of Indiana's voter ID law in full; the plaintiffs did not seek any alternative narrower relief.[4] By contrast, Plaintiffs seek an injunction mandating that Defendants accept student photo ID cards issued by accredited, not-for-profit postsecondary educational institutions in Tennessee. A facial challenge does not *per se* call for the invalidation of an entire statute—the remedy can be declaratory relief and narrower injunctive relief that cures the facial unconstitutionality of the statute. Recently, in *Veasey v. Abbott*, the Fifth Circuit affirmed the district court's judgment finding Texas' voter ID law violates Section 2 of the Voting Rights Act, and this claim was a facial attack on the law. 796 F.3d 487, 512-13 (5th Cir. 2015). Nevertheless, the panel decision vacated the district court's invalidation of the statute and remanded the case for the district court to weigh the

---

[4] The Second Amended Complaint can be viewed here:
http://moritzlaw.osu.edu/electionlaw/docs/indydems/secondamendedcomplaint.pdf.

possibility of crafting a narrower remedy to cure the law's discriminatory effect. *Id.* at 517-20. Even *Crawford* itself left open the possibility of lesser remedies, if a facial challenge prevailed: "[P]etitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute." 553 U.S. at 203. Accordingly, Defendants' citations to *United States v. Salerno*, 481 U.S. 739, 745 (1987) and its progeny are inapposite because Plaintiffs do not seek to permanently enjoin the enforcement of Tennessee's voter ID law but rather to require Defendants to accept an additional category of photo IDs as accepted voter ID.

## II. THE FIRST AMENDED COMPLAINT STATES A CLAIM UNDER THE TWENTY-SIXTH AMENDMENT.

### A. THE TWENTY-SIXTH AMENDMENT PROHIBITS BOTH DENIAL AND ABRIDGEMENT OF THE RIGHT TO VOTE.

Defendants fault Plaintiffs for not pleading what steps they have taken to obtain a free voter ID. However, the Twenty-Sixth Amendment does not only forbid vote denial but also the *abridgement* of the right to vote, which is why the FAC alleges denial or abridgement in the alternative. U.S. CONST. amend. XXVI. At a bare minimum, Plaintiffs have stated a vote abridgement claim under the Twenty-Sixth Amendment, given all the older voters who have been exempted from the need to gather primary documentation (often at a cost), travel to a Driver Service Center and apply for an Identification Only License. DE 36 PageID #303 ¶ 29, #312-20 ¶¶ 43-60. In *Worden v. Mercer County Board of Elections*, the Supreme Court of New Jersey stated:

> The legislative history preceding the adoption of the amendment clearly evidences the purpose not only of extending the voting right to younger voters but also of encouraging their participation by the elimination of all unnecessary burdens and barriers. Thus the Senate Report (S.Rep. No. 26, 92d Cong., 1st Sess. (1971)), specifically noted (at 14) that 'forcing young voters to undertake special burdens—obtaining absentee ballots, *or traveling to one centralized location in*

6

*each city*, for example—in order to exercise their right to vote might well serve to dissuade them from participating in the election. This result, and the election procedures that create it, are at least inconsistent with the purpose of the Voting Rights Act, which sought to encourage greater political participation on the part of the young; such segregation might even amount to a denial of their 14th Amendment right to equal protection of the laws in the exercise of the franchise.'
*It is significant that the twenty-sixth amendment prohibited not only denial but also abridgment of the voting rights granted to the younger voters, many of whom as the congressional and legislative members well know, would be resident in their college communities at election time.*

61 N.J. 325, 333-34 (1972) (emphasis added). As noted by the California Supreme Court in *Jolicoeur*, the Twenty-Sixth Amendment, just like the Fifteenth Amendment, "'nullifies sophisticated as well as simple-minded modes of discrimination.'" *Jolicoeur v. Mihaly*, 488 P.2d 1, 4 (Ca. 1971) (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)); *see also Walgren v. Howes*, 482 F.2d 95, 101-02 (1st Cir. 1973) ("*Walgren I*"). The *Jolicoeur* court also noted "[t]he word 'abridge' means diminish, curtail, deprive, cut off, reduce." 488 P.2d at 4 (collecting cases); *Gray v. Johnson*, 234 F. Supp. 743, 746 (S.D. Miss. 1964) ("The word 'abridge', according to Webster's New International Dictionary, Second Edition, means to diminish or curtail; to deprive, to cutoff. When the word is used in connection with and following the word 'deny', it means to circumscribe or burden.").

The Twenty-Sixth Amendment was rapidly ratified in 1971 after *Oregon v. Mitchell*, 400 U.S. 112 (1970) struck down Title III of the Voting Rights Act as to state and local elections, threatening a dual-track voting system to accommodate 18-to-20 year-olds who would only be eligible to vote in federal elections. It is particularly instructive that the proposed administrative fixes, which called for the differential treatment of these newly enfranchised voters, were resoundingly condemned. That reaction and the foreseeable administrative debacle are what drove the ratification of the Twenty-Sixth Amendment just 100 days after it passed Congress:

Hearings held in the Senate after the court's decision in *Oregon v. Mitchell*, *Supra*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272, made clear what steps individual states might take to solve some of these administrative problems. Senate Report 92—[26] [*sic*] recommends adoption of the Twenty-Sixth Amendment as one way of precluding individual states from embarking on several programs of which the Judiciary Committee strongly disapproved. Significantly, programs which would force youths to vote by absentee ballot or otherwise single them out came in for severe condemnation: *'A few States are at least considering the possibility of requiring them to vote either in centralized locations or by absentee ballot. But this type of alternative has fostered criticism on several grounds. At least one voting official has criticized this type of segregation of the younger voters because it would give them less of a sense of participation in the election system, and they should not be removed from the heart of the process. . . .'*

*Jolicoeur*, 488 P.2d at 6 (quoting 1971 U.S.C.C.A.N. 374-75) (emphasis added).

Notably, the Senators did not ask whether these proposals would be difficult for younger voters to comply with; they rejected the discriminatory treatment outright as abhorrent.

Measures that discourage and deter voters constitute abridgement as well.

### B. THE TWENTY-SIXTH AMENDMENT BROADLY PROHIBITS AGE DISCRIMINATION, NOT JUST LAWS THAT EXCLUSIVELY TARGET 18-TO-20-YEAR-OLDS.

The Twenty-Sixth Amendment does not merely protect 18-to-20-year-olds. Section 1 of the Twenty-Sixth Amendment states: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. CONST. amend. XXVI, § 1. It is directly modeled on the Fifteenth Amendment ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."), U.S. CONST. Amend. XV, § 1, and the Nineteenth Amendment ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."), U.S. CONST. amend. XIX; *see also Walgren I*, 482 F.2d at 101 ("[B]oth the Fifteenth and

Nineteenth Amendments served as models for the Twenty-Sixth . . . ."); 117 Cong. Rec. 7533, 7539 (1971); *id.* at 7534 (statement of Rep. Richard Poff) ("Just as the 15th Amendment prohibits racial discrimination in voting . . . the proposed amendment would prohibit age discrimination in voting."); S. REP. NO. 92-26, at 2 (1971) ("This section embodies the language and formulation of the 19th Amendment . . . and that of the 15th Amendment . . .").[5] While the immediate consequences of the Fifteenth, Nineteenth and Twenty-Sixth Amendments were enfranchising African Americans, women and 18-to-20-year-olds, respectively, the plain text of each amendment makes clear that they more broadly outlawed race, sex and age discrimination in voting. White voters are protected to the same extent as any other racial group under the Fifteenth Amendment. *See, e g.*, *United States v. Brown*, 494 F. Supp. 2d 440, 480-87 (S.D. Miss. 2007) (finding racially-motivated manipulation of county's electoral process had detrimental impact on white voters, violating Section 2 of Voting Rights Act which enforces the Fifteenth Amendment), *aff'd by* 561 F.3d 420 (5th Cir. 2009). If a statute allowed women to register on Election Day but forbade men from doing the same, that law would violate the Nineteenth Amendment. If senior citizens were required to present an ID at the polls but all other voters were exempt from that requirement, this scheme would violate the Twenty-Sixth Amendment. *Gaunt v. Brown*, 341 F. Supp. 1187, 1191 (S.D. Ohio 1972) ("'[The Twenty-Sixth Amendment] does not grant the right to vote to all citizens 18 years of age or older. Rather it guarantees that citizens who are 18 years of age or older shall not be discriminated against on account of age.'" (quoting 117 Cong. Rec. 7534)).

Defendants' argument is essentially that the Twenty-Sixth Amendment does not

---

[5] This Senate Report has been attached as Exhibit 1.

mean what it says. They ignore the parallel language in the Fifteenth and Nineteenth Amendments and fail to notice that the Twenty-Sixth Amendment sets a minimum voting age but no maximum age for voters who can claim age discrimination. While a number of Twenty-Sixth Amendment cases have concerned attacks on minors or 18-to-20-year-olds – precisely because those laws sought to prevent newly-enfranchised students from registering and voting in college towns – these cases by no means set an upper bound on the Amendment's protection or limited its coverage to express numerical-age classifications. *See, e.g.*, *Ownby v. Dies*, 337 F. Supp. 38, 39 (E.D. Tex. 1971) (striking down different basis for determining voting residency for those under 21 years of age); *Jolicoeur*, 488 P.2d at 11-12 (enjoining different procedures and qualifications for unmarried minors). These were crude first-generation attacks on newly-enfranchised young voters; the second-generation attacks have replaced numerical-age classifications and laws targeting "minors" with the designation "college or university student" but are aimed at suppressing the exact same group of voters.[6] In *Worden*, for example, the class of on-campus students of all ages without an independent domicile in Mercer County were subjected to additional questioning when they sought to register, but nursing students were arbitrarily exempted and faculty were registered without any extra scrutiny even though they are "'very mobile.'" 61 N.J. at 329-30, 348. These discriminatory

---

[6] In striking down Tennessee's one-year durational residency requirement in *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court cited as evidence of an "impermissible purpose" the state's reliance on the Twenty-Sixth Amendment's recent ratification. *Id.* at 356 n.28. The state's brief contained the following sentence: "'The fact that the voting privilege has been extended to 18 year old persons . . . increases, rather than diminishes, the need for durational residency requirements.'" *Id.*; *see also* Kenneth J. Guido, Jr., *Student Voting and Residency Qualifications: The Aftermath of the Twenty-Sixth Amendment*, 47 N.Y.U. L. Rev. 32, 33, 58 (1972).

10

practices were struck down on Twenty-Sixth Amendment grounds even without any evidence that these students uniformly fit a certain age range.

Defendants cite *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), *summarily affirmed sub nom. Symm v. U.S.*, 439 U.S. 1105 (1979), as if it supports their position that the Twenty-Sixth Amendment only applies to 18-to-20 year olds. They assert that dorm residents "are more likely than other college and university students to be between the ages of 18 and 20" without citation to the *United States v. Texas* opinion, record or any other source. DE 43 PageID #474-75. The opinion in fact does not establish that the targeted class was exclusively or even disproportionately aged 18 to 20. In requiring the Waller County registrar to register Prairie View A&M University students with the same standards and procedures as all other eligible voters, not with questionnaires probing their residency, the district court noted that "undergraduates from outside Waller County were required to live in the dormitory" and "Prairie View freshmen were normally in the 17-19 age bracket" but did not give an age breakdown for dorm residents as a class.[7] 445 F. Supp. at 1249. The questionnaire was in fact given to Prairie View students and all other persons "with addresses on the campus." *Id.* at 1253. While the registrar did not think dorms qualified as permanent residences, he thought

---

[7] This unsubstantiated assertion did not prevent Defendants from emphasizing that *Walgren v. Board of Selectmen of Town of Amherst*, 519 F.2d 1364 (1st Cir. 1975) ("*Walgren II*") credited the district court's "conclusion as to the speculativeness of determining whether 18-20 year old voters were disproportionately burdened," *id.* at 1367, by holding a town caucus during a winter recess when many dorm students would be out of town. *Id.* at 1365; DE 43 PageID #475. In any event, the Twenty-Sixth Amendment's protection is not confined to the age bracket of voters it immediately enfranchised. Plaintiffs submit that the extreme remedy sought – invalidating an election – shaped the reasoning and outcome. The court cautioned that its opinion was limited to the circumstances and should not be read as license to deliberately hold elections during recesses "without a showing of some substantial justification." 519 F.2d at 1367-68.

"students" needed to "do something to qualify as permanent residents."  *Id*. at 1251; *id*. at 1252 (noting registrar's belief that "neither [servicemen nor students] are residents, as a general rule, of the place where they are stationed or attending school").  The registrar's practices did not actually target all students or draw a bright line at dorm residence:

> Students at Prairie View whose parents live in Waller County are treated differently from other students. These Prairie View students, the children of Waller County natives, are registered without question. In addition, married students, even if they reside in the dorms with their spouses, would be routinely registered, but not single students.

*Id*.  Ultimately, the targeted group (the opinion refers throughout to "students") was somewhat over-inclusive, in that it included non-students and older students but surely targeted a young, newly-enfranchised student population who were perceived as merely temporary residents.  And it was somewhat under-inclusive, in that it excluded married students of any age, native Waller County students of any age and students of any age who have "been promised a job in Waller County" after graduation.  *Id*. at 1259.  Nevertheless, that did not prevent the three-judge court and the Supreme Court from concluding the county had discriminated "on account of age" in violation of the Twenty-Sixth Amendment.

The full history of the Twenty-Sixth Amendment's ratification also supports the conclusion that it bars age discrimination and that safeguarding college students' right to vote were fully part of the Amendment's purposes.  In *Walgren I*, the First Circuit found Plaintiffs had stated a Twenty-Sixth Amendment claim, noting that the legislative history of the Amendment demonstrates that the ban on age discrimination was inextricably intertwined with protection for college youth's voting rights:

> Perhaps most clear is the purpose of the amendment in the light of its history. In addition to avoiding what would have been an administrative nightmare brought

upon by the decision in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), the backers of the amendment argued that, young persons between 18 and 21 being otherwise treated as adults for purposes of civil and criminal responsibility and military service, it was anomalous to deny them the franchise right; and that the frustration of politically unemancipated young persons, which had manifested itself in serious mass disturbances, *occurring for the most part on college campuses*, would be alleviated and energies channeled constructively through the exercise of the right to vote. It is this latter goal, seeking to substitute the ballot for the bullet, with which we are concerned. *Thus, while the Twenty-Sixth Amendment speaks only to age discrimination, it has, as noted by Senators Percy and Brooke, among many other legislators, particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment. 117 Cong.Rec. 5817, 5825.*

482 F.2d at 100-01 (emphasis added).[8]  The court also noted that: "The specific problem faced by college communities with concentrated youth populations was faced in the consideration of the Twenty-Sixth Amendment. To the expressed fears of campus takeovers of small communities –since 'the student body [is] composed largely of 18 to 21-year-olds'–the candid response in debate was that if students 'satisfy the residency requirement of that town obviously they would be entitled to vote.' 117 Cong.Rec. 7538-39, 7547."  482 F.2d at 102.  While students at universities are not all "young" – as slippery a term as "old" – college students were considered a proxy for the youth vote during the Congressional debates on the Twenty-Sixth Amendment.  Though 18-to-20-year-olds were the immediate beneficiaries of its ratification, confining the Amendment to that age bracket ignores the historical context of its ratification and the immediate

---

[8] Defendants rely on *Walgren II*, 519 F.2d at 1367-68, which found <u>insufficient evidence</u> to invalidate the election.  But they do not cite the prior First Circuit opinion, which did conclude that the plaintiffs had pleaded <u>sufficient allegations</u> to state a Twenty-Sixth Amendment claim, even though the scheduling of an election during a winter recess is unrelated to any numerical-age classification.  *Walgren I*, 482 F.2d at 100-02.

aftermath during which counties and towns took steps to restrict young students' access

to the ballot and not solely with numerical-age classifications.[9]

### C. PLAINTIFFS HAVE STATED A CLAIM OF INTENTIONAL AGE-BASED DISCRIMINATION, INCLUDING BOTH DISCRIMINATORY INTENT AND DISPARATE IMPACT.

Defendants proceed to argue that the FAC does not state a claim of intentional age

discrimination under the Twenty-Sixth Amendment. The legal standard for a Twenty-

Sixth Amendment claim tracks that which is used for the parallel Fifteenth Amendment.

Discriminatory intent is an element of a Twenty-Sixth Amendment claim because it is

modeled on the Fifteenth Amendment, which has been construed to require

discriminatory intent. *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 62-64 (1980),

*abrogated on other grounds by* Pub. L. 97-205, § 3 (1982), 96 Stat. 134; *Mixon v. Ohio*,

193 F.3d 389, 407 (6th Cir. 1999). Intentional discrimination cases require proof of

discriminatory intent and proof of disparate impact. *Village of Arlington Heights v.

Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). "Determining whether

invidious discriminatory purpose was a motivating factor demands a sensitive inquiry

into such circumstantial and direct evidence of intent as may be available." *Id*. at 266.

Disparate impact can serve as evidence of discriminatory intent but, where the pattern is

not "stark," then "impact alone is not determinative, and the Court must look to other

evidence." *Id*. Other circumstantial evidence of intent may include: "[t]he historical

---

[9] *See also* Eric S. Fish, *Note: The Twenty-Sixth Amendment Enforcement Power*, 121 Yale L.J. 1168, 1220-22 (2012). One witness during the Senate hearings on the proposed Twenty-Sixth Amendment made clear that part of the purpose of the amendment was to "reverse the presently poor turnout of voters in the 21 to 40 category." S. REP. NO. 92-26, at 3 (1971). The effects of disenfranchising 18-to-20 year old college-age voters presently "subject to the 'stimulation' of courses in citizenship and American history," *id*., had proven difficult to undo, and lowering the age threshold was thought to be a solution to civic disengagement of a broader range of younger voters.

14

background of the decision"; "[t]he specific sequence of events leading up [to] [*sic*] the challenged decision"; "[d]epartures from the normal procedural sequence"; "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and "[t]he legislative or administrative history[.]" *Id.* at 267-68.

The challenged law need not exclusively target younger voters; younger voters just need to be one of the principal targets or "but-for" motivations of a discriminatory action. In *Hunter v. Underwood*, the Supreme Court struck down the Alabama Constitution's felon disenfranchisement provision as a violation of the Fourteenth Amendment because it had been passed with racially discriminatory intent. 471 U.S. 222 (1985). It did so even though the law also disenfranchised poor whites, and "appellants maintain[ed] on the basis of their expert's testimony that the real purpose behind § 182 was to disenfranchise poor whites as well as blacks." *Id.* at 230.[10] The Supreme Court held that:

> The explanation concedes both that discrimination against blacks, as well as against poor whites, was a motivating factor for the provision and that § 182 certainly would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation.
>
> . . . [I]t is clear that where both impermissible racial motivation and racially discriminatory impact are demonstrated, *Arlington Heights* and *Mt. Healthy* supply the proper analysis. Under the view that the Court of Appeals could

---

[10] Notably, one of the appellees was black and the other was white. *Underwood*, 471 U.S. at 223-24. Defendants repeatedly refer to Jarrett Harper's age (30) as if it disproves that there was intentional age discrimination in this case. Plaintiffs have included Mr. Harper as a Plaintiff to acknowledge that not all students are in the 18-to-22 age range, but (1) all the other plaintiffs are 18 and 19 years old (though some may now have subsequently turned 19 or 20), and (2) the postsecondary student population still contains so many "young" people that targeting college and university students categorically is an effective way in which to suppress the turnout of young voters and skew electoral turnout.

properly take of the evidence, an additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks, and it is beyond peradventure that the latter was a "but-for" motivation for the enactment of § 182.

*Id*. at 231-32. In a case of intentional age discrimination, plaintiffs need not allege that the law exclusively targets or burdens younger voters at colleges and universities. Rather, a claim is sufficiently stated if the law and surrounding history make clear that younger voters are being targeted "on account of age" and older voters are being deliberately shielded from the law's burdens. *Arlington Heights*, 429 U.S. at 265 ("[*Washington v. Davis*] does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.").

Plaintiffs have alleged a disparate impact on young voters. In a section of the Complaint entitled "Impact of the Voter ID Law on Youth and Student Voting," Plaintiffs have alleged the disparate impact of the voter ID law on young voters in Tennessee:

> In a report issued in September 2014 about state voter identification laws, the U.S. Government Accountability Office estimated that turnout for Tennessee voters aged 18 and Tennessee voters aged 19 to 23 dropped by 4.1 percentage points and 4.0 percentage points, respectively. As age increased, the estimated impact of the law decreased: "[W]e found that in both Kansas and Tennessee, as registrants' age increased, the effects of changes in voter ID laws had decreasing effects on turnout . . ."

DE 36 PageID #322 ¶ 70. Not only did the General Assembly intend to discriminate against "young college students," "younger voters" and "younger student voters," "discriminate[ ] against young Tennessee college and university student voters, while more favorably treating older voters," and take steps "designed to suppress the turnout of young college and university student voters in Tennessee" (DE 36 PageID #293 ¶ 2, #313 ¶¶ 44-45, #323 ¶ 74, #325 ¶ 81), but as Paragraph 70 of the FAC clearly alleges, according to a federal government study, the series of interconnected actions have had the

16

desired disparate impact on younger voters' turnout.[11]  Defendants' citation to nationwide

statistics on the ages of college and university students does not alter the fact that the law

had a disproportionate impact on younger voters in Tennessee.[12]  Had Plaintiffs only

alleged that college students are disproportionately younger, Defendants could have

reasonably argued there was no allegation of disparate impact.  Plaintiffs have instead

actually alleged the disparate impact on <u>young</u> voters and have done so by reference to a

specific federal government study's conclusions, not just with a bare assertion.

　　　As to discriminatory intent, the FAC sets forth a multitude of interconnected facts

which strongly point to an intent to suppress young voters in Tennessee by excluding

---

[11] U.S. Government Accountability Office, *ELECTIONS: Issues Related to State Voter Identification Laws* [GAO-14-634] (Reissued Feb. 27, 2015), *available at* http://www.gao.gov/products/GAO-14-634.

[12] College and university students in Tennessee are in fact disproportionately younger than the population at large, making this group an ideal target for suppressing youth turnout.  Defendants cite to nationwide college and university enrollment statistics, but that is not the relevant data set.  In the Tennessee Higher Education Commission's 2014-2015 Tennessee Higher Education Fact Book, *available at* https://www.tn.gov/assets/entities/thec/attachments/2014-15_Factbook.pdf, Table 1.13 shows that at Tennessee Board of Regents universities and community colleges and University of Tennessee universities, with the sole exception of UT-Health Science Center, the undergraduate headcount for each institution reflects majorities (frequently very large majorities) of students are ages 24 and under, with 92.2 percent for UT-Knoxville, 88.5 percent for the UT system, and 75.9 percent for the TBR universities.  Table 1.10 shows that only 10.5 percent of the students at Tennessee's public universities are enrolled in graduate and professional programs.  Moreover, the U.S. Census Bureau's American Community Survey 2014 1-Year Estimates reveal that nearly 59 percent of Tennessee's public institution students are ages 18 to 24 and 82.13 percent are ages 18 to 34.  55.6 percent of private students are ages 18 to 24 and 79 percent are ages 18 to 34, though these figures include private for-profit institutions, which are not embraced by this lawsuit.  *See* U.S. Census Bureau, 2014 AMERICAN COMMUNITY SURVEY 1-YEAR ESTIMATES, SEX BY COLLEGE OR GRADUATE SCHOOL ENROLLMENT BY TYPE OF SCHOOL BY AGE FOR THE POPULATION 15 YEARS AND OVER [B14004].  This data set is available at the following link but a filter for the State of Tennessee must be applied: http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_1 4_1YR_B14004&prodType=table.  In any event, this is a question of evidentiary sufficiency or proof, not a question of legal sufficiency on a motion to dismiss.

student ID cards and making it easier for older voters to comply with or avoid the voter ID law. This effectively tipped the electoral balance in favor of older voters. First, Tennessee's voter ID law contains an express exclusion of a form of photo ID held by many young voters throughout the state. While some students will retain their student IDs even after they graduate, incoming freshmen – especially those who establish residency in Tennessee following high school in another state – usually only have another state's driver license and a student ID card. DE 36 PageID #297-99 ¶¶ 11-17. If they enroll in September before a November presidential election, they have exactly two months to learn of the voter ID law and acquire a compliant voter ID.

Second, the General Assembly has deliberately preserved non-student (such as faculty, staff, retiree or contractor) public college and university IDs as voter ID. Representative Joe Pitts (*id*. PageID #302-03 ¶ 27), Senator Bill Ketron (*id*. PageID #305-06 ¶ 32) and Representative Susan Lynn (*id*. PageID #306-07 ¶¶ 34-35) repeatedly explained to fellow legislators that public college and university student IDs were being handled "inconsistent[ly]" (*id*. PageID #305-06 ¶ 32) and yet each time a bill was proposed from 2011 to 2015 to add college and university student IDs or just public school student IDs, it was defeated or amended to preserve the original exclusion. *Id*. PageID #299-300 ¶ 20, #302-03 ¶ 27, #307 ¶ 35, #309-12 ¶¶ 40-42. This is not a state like Texas or South Carolina, where all college and university ID cards are barred categorically for voting purposes. Evidence as to the relative ages of the student and non-student groups goes to proof, not legal sufficiency, and statistics reflecting the ages of Tennessee's enrolled student population for accredited, non-profit postsecondary educational institutions are only relevant to discriminatory intent insofar as they were: (1)

known to state legislators who pushed the voter ID law, and (2) colored their understanding and usage of the word "student."

Third, the FAC also contains statements made by certain legislators in the course of deliberations on bills and amendments to include or exclude student ID cards which reveal biased perceptions of <u>under-age</u> college students who are allegedly making or buying fake IDs to get into nightclubs and buy beer. For instance, Rep. Curry Todd argued they use fake student ID cards to "get into nightclubs and other things." DE 36 PageID #302-03 ¶ 27, #305-06 ¶ 32, #307-08 ¶¶ 35-36. In considering HB 2730 in 2012, Former Rep. Eric Watson recited a story of a minor using a fake college ID to buy alcohol at an O'Charley's, which resulted in a fatal drunk driving accident. This hearing is referred to in the last sentence of Paragraph 27 of the FAC. *See id*. ¶ 27; Tenn. General Assembly, 107th Sess. (2012), House State and Local Gov't Comm. Hearing (HB 2730), *available at* [http://tnga.granicus.com/MediaPlayer.php?view_id=196&clip_id=5290](http://tnga.granicus.com/MediaPlayer.php?view_id=196&clip_id=5290); *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.").[13] Legislators who tried to add student IDs to the list also made statements which reveal that members had <u>young</u> voters in mind when debating the inclusion or exclusion of college student ID cards. DE 36 PageID #308 ¶ 34 (Rep. Susan Lynn stating "'*Your parents* have to give their taxes

---

[13] If the Motion to Dismiss is granted in part, Plaintiffs request leave to file a Second Amended Complaint to add additional legislator statements directed at young voters, as well as the Secretary of State's wildly disparate public education campaigns for younger student voters and older voters, respectively.

and you might have to give your taxes . . .'"").

Negative perceptions of <u>young</u> Tennessee college and university students as partying undergraduates seeking fake IDs are what fueled the exclusion of student ID cards from the list of accepted voter IDs, not perceptions of graduate students. That so many legislators repeated these assertions concerning the allegedly rampant forgery of student IDs demonstrates that the proponents of excluding student IDs were focused on <u>minors</u> trying to misrepresent their age and settled on the spurious excuse that student IDs were uniquely susceptible to fraud. DE 36 PageID #299-300 ¶ 20, #302-03 ¶ 27, #305-06 ¶ 32, #307-08 ¶¶ 35-36. Moreover, these irrational statements are not supported by any facts or evidence. As alleged, student ID cards do not contain ages or dates of birth so they cannot be used to buy beer or enter nightclubs, and student ID cards are not uniquely susceptible to fraudulent duplication, as the well-known black market for driver licenses and state ID cards with ages and/or dates of birth betrays. DE 36 PageID #302 ¶ 27, #325 ¶ 81. Defendants can argue these statements and the student ID card exclusion they inspired were equally intended for older graduate students, Ph.D. candidates, and continuing education or mid-career students but that is a fact question for resolution on motions for summary judgment or at trial, not on a motion to dismiss. "In reviewing a motion to dismiss, [the court] construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Defendants cite statistics on the range of postsecondary students' ages but that does not negate the inference that these legislators sought to eliminate student IDs to suppress the youth vote and skew the electorate's composition. The statistics on students' ages at Tennessee's

postsecondary schools are relevant but, since the inquiry turns on the subjective meaning of the word "students," as invoked by legislators in the context of their other statements and arguments, the case cannot be dismissed on the basis of statistics.[14]

Fourth, while by-excuse-only absentee voting and the age-based excuse for 65-year-olds precede 2011, 1994 Pub. Acts, c. 859, § 2, the <u>exemption</u> of absentee voting from the voter ID requirement was contemporaneous. DE 36 PageID #300-01 ¶ 23. Tennessee legislators sought repeatedly to exempt senior citizens from the law categorically, but having been informed by their counsel that this would be unconstitutional, *id.* ¶ 21, they settled for the absentee voting exemption. Even after the law went into effect, members were still trying to categorically exempt voters aged 65 and up or, alternatively, voters at least 60 years old. *Id.* PageID #302 ¶ 26.

Fifth, after the voter ID law passed, legislators realized they had a problem, a problem unique to Tennessee because it was the only state in the country issuing non-photo driver licenses. These non-photo IDs were only issued to residents at least 60 years old, and thousands of these individuals would be disenfranchised unless they obtained a free voter ID from a Driver Service Center or some legislative fix was devised. The General Assembly's strong bias in favor of these older voters without compliant voter ID is self-evident. In 2012, they quickly and without much dissent passed a law aligning the absentee voting age threshold with the non-photo driver license age threshold, by lowering it from 65 to 60, so that these non-photo driver license holders would not need

---

[14] *Bright v. Baesler*, 336 F. Supp. 527 (E.D. Ky. 1971) is distinguishable on its procedural posture. The court rendered its judgment on the Twenty-Sixth Amendment claim based on "the evidence adduced at the hearing and submitted in the record." *Id.* at 531-32. Defendants have mischaracterized this case as a dismissal for failure to state a claim. DE 43 PageID #476.

to convert that ID to a photo ID at a Driver Service Center. DE 36 PageID #303-04 ¶ 29. While the General Assembly did vote to phase out non-photo driver licenses, the July 1, 2017 sunset provision for the lower absentee voting age threshold indicates a clear intent to shield voters aged 60 to 64 from the effects of the voter ID law, until such time as they could reach age 65 and vote absentee without submitting or showing a photo ID. *Id*.

Sixth, with almost no opposition, the General Assembly added retired state employee IDs to the list of accepted voter ID. *Id*. PageID #301-02 ¶ 25. Plaintiffs also alleged on information and belief that these retirees are "typically older" than college students. *Id*.

Seventh, Plaintiffs have also alleged procedural departures that betray an animus towards young students. *Arlington Heights*, 429 U.S. at 267. During a March 2014 House subcommittee hearing, after an amendment to add public student ID cards to the voter ID law failed and was sent to the Tennessee Advisory Commission on Intergovernmental Relations ("TACIR") for study, the Chair called for a five-minute recess following a student protest, abruptly recognized a quorum after only one minute had elapsed (and members were still absent from the room) and the subcommittee reversed its decision on the TACIR study of student IDs. DE 36 PageID #309-10 ¶¶ 40-41. The Chair referred to the student's civil protest as a "hijack." *Id*.

Defendants would like the Court to ignore these facts and focus solely on the statutory student ID exclusion. They do not want the Court to pay attention to allegations as to how Section 2-7-112 interacts with other election statutes or allegations concerning laws that were enacted as a direct consequence of the voter ID law and intended to assist older voters. The FAC alleges that the express student ID card exclusion sought to

discriminate against younger voters on account of their age. DE 36 PageID #293 ¶ 2, #313 ¶¶ 44-45, #323 ¶ 74, #325 ¶ 81. Where, as alleged in the FAC, there is not even a rational basis for the differential treatment of younger and older voters and the statements made by legislators frequently refer to minor students in connection with the principal reason for rejecting student IDs, the reasonable inference is that the law or provision lacks a nondiscriminatory purpose and intends to target certain voters "on account of age." A voting law that has the purpose and effect of skewing the electorate towards the older end of the spectrum violates the Twenty-Sixth Amendment. Accordingly, Plaintiffs have stated a Twenty-Sixth Amendment age discrimination claim.

### III. THE FIRST AMENDED COMPLAINT STATES A CLAIM OF THE DENIAL OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT.

Defendants have first argued (expressly or impliedly) that the *Anderson/ Burdick/Crawford* test completely displaces all Fourteenth Amendment equal protection jurisprudence when a voting law is challenged and therefore controls Plaintiffs' Count II. The Supreme Court has never so held.

In *Carrington v. Rash*, 380 U.S. 89 (1965), the Supreme Court struck down a Texas constitutional provision prohibiting members of the U.S. Armed Forces stationed in Texas from casting ballots, stating: "'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Id.* at 94. As a legal framework, the Court recited the following propositions: (1) "'[T]he privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution.'"

(*id.* at 91 (quoting *Pope v. Williams*, 193 U.S. 621, 632 (1904)); and (2) "'The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose.'" *Id.* at 93 (quoting *McLaughlin v. State of Florida*, 379 U.S. 184, 191 (1964)). The Supreme Court has never overruled *Carrington* but, more importantly, its subsequent cases demonstrate that facially discriminatory classifications are not rendered constitutional by minimal burdens.

In *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), the Supreme Court found no preclusion of the right to vote by failing to include certain inmates in an absentee voting statute and so applied rational basis review: "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal." *Id.* at 809. It is also significant that the Supreme Court did not require a total absence of burdens before applying rational basis review—instead, it moved on to rational basis review after noting the appellants were not "precluded . . . from voting." *Id.* at 808. *McDonald*'s analytical framework remains good law and is on point here.

In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), a case challenging a ballot access regulation, the Supreme Court stated:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer, supra*, 415 U.S., at 730, 94 S.Ct., at 1279. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must

consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id*. at 789. But the Court also underscored that "the state's important regulatory interests are generally sufficient to justify reasonable, *nondiscriminatory* restrictions." *Id*. at 788 (emphasis added). This means that any such voting restriction must be nondiscriminatory before one would even apply *Anderson* balancing, and discrimination is an independent basis for challenging the law. *Burdick v. Takushi* later summarized the *Anderson* test:

> [A]s we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, *nondiscriminatory* restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; see also *id*., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

504 U.S. 428, 434 (1992) (emphasis added). The *Anderson/Burdick* test does not say what the legal standard is when the election law is claimed to be unreasonable and discriminatory; it merely states what occurs when the law is "reasonable" and "nondiscriminatory." *Id*. at 434. This presumes that freestanding equal protection claims under the Fourteenth Amendment remain the vehicle by which one would challenge a state law as discriminatory. Finally, *Crawford* changes nothing about the *Anderson* test—the Indiana law contained no discriminatory classifications and did "not qualify as a substantial burden on the right to vote." 553 U.S. at 189-91, 198-99.

The reason *Anderson* (an early filing deadline for independent candidates), *Burdick* (a ban on write-in voting) and *Crawford* (Indiana's photographic voter ID law) are all silent on the proper standard when a plaintiff claims discrimination in voting is that none of these cases concerned a law containing a discriminatory classification on its

face, as in Tennessee's law. These cases' summaries of the *Anderson* test all <u>presume</u> non-discrimination. Tennessee's voter ID law is not just another normal voter ID law which merely enumerates the forms of photo ID that can be shown; the Tennessee General Assembly did what no other legislature has done and inserted an express exclusion of IDs held by a class of individuals. This is a clear discriminatory classification and, therefore, rational basis review must be applied.[15] *See, e.g.*, *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2083 (2012) ("[T]he Constitution does not require the City to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line.").

If it were true that *Anderson/Burdick/Crawford* had displaced all Fourteenth Amendment equal protection jurisprudence in the voting context, then a suit challenging a law requiring all people who are shorter than 5'5" to register to vote in person at a county election commission office, but allowing those 5'5" or taller may register by mail, would be analyzed by comparing the law's burdens to the state's interests, even though it

---

[15] Defendants have not cited *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012) in their opening brief but that case also does not hold that *Anderson/Burdick* displaces Fourteenth Amendment equal protection jurisprudence in the election law context. *Id.* at 428-32. "If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." *Id.* at 429 (citing *McDonald*, 394 U.S. at 807-09). It would be highly anomalous to force Plaintiffs' claims into the *Anderson/Burdick* framework – which was deliberately not cited in the FAC – in order to dismiss the claims, as Defendants request, when the claims would survive dismissal on a rational basis test. This would also not be construing the allegations in the Plaintiffs' favor. All differential treatment necessarily yields differential burdens. The burdens of the free voter ID process were merely recounted in the FAC as a way to demonstrate the outcome of the differential treatment of younger and older voters. Should Count II be dismissed, Plaintiffs request the opportunity to file a Second Amended Complaint to make it unmistakably clear that Count II is a "straightforward rational basis" claim. *Id.*

is clearly irrational discrimination. The Supreme Court's precedent makes clear that the irrational classification would simply be struck down; whether the burdens on people shorter than 5'5" are minimal or substantial or severe is completely irrelevant. Even more absurdly, if *Anderson/Burdick/Crawford* controlled all discrimination claims in the voting context, a case of facial national origin discrimination under the Fourteenth Amendment would need to weigh the burdens on the expressly excluded Chinese-American or Mexican-American U.S. citizens, instead of just applying normal strict scrutiny analysis which requires the law be narrowly tailored to a compelling government interest. *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971). The burdens on the excluded class of foreign-born U.S. citizens could be extremely minimal as compared to the proffered interests but such a nakedly discriminatory law would of course still be struck down. *Anderson*, *Burdick* and *Crawford* do not contemplate displacing independent, freestanding equal protection claims against discriminatory classifications.

As in the above hypothetical cases, Count II alleges that there is no rational basis for treating student ID cards different from non-student ID cards issued by pubic postsecondary institutions in Tennessee. Defendants cite to *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307 (1993) for the proposition that, under rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id*. at 315. However, recent Supreme Court decisions call this proposition into question, as the Ninth Circuit recently explained in *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (9th Cir. 2014):

> Unlike in rational basis review, hypothetical reasons for [the Defense of Marriage Act's] DOMA's enactment were not a basis of the Court's inquiry. In its brief to

the Supreme Court, the Bipartisan Legal Advisory Group offered five distinct rational bases for the law. *See* Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives at 28–48, [*United States v.*] *Windsor*, 133 S.Ct. 2675 (2013) (No. 12–307), 2013 WL 267026. *Windsor*, however, looked behind these justifications to consider Congress's "avowed purpose:" "The principal purpose," it declared, "is to impose inequality, not for other reasons like governmental efficiency." *Windsor*, 133 S.Ct. at 2693, 2694. The result of this more fundamental inquiry was the Supreme Court's conclusion that DOMA's "demonstrated purpose" "raise[d] a most serious question under the Constitution's Fifth Amendment." *Id.* at 2693–94 (emphasis added). *Windsor* thus requires not that we conceive of hypothetical purposes, but that we scrutinize Congress's actual purposes.

*Id.* at 481-82.[16] Even if this Court does not adopt *SmithKline*'s reasoning, Plaintiffs have stated an equal protection claim because the line the Tennessee General Assembly has drawn lacks even that "conceivable modicum of rationality." *Wagner v. Haslam*, No. 3:15-CV-115, 2015 WL 3658165, at *15 (M.D. Tenn. June 12, 2015).

Defendants argue that Plaintiffs have failed to allege that public college and university students are not "similarly situated" to faculty and staff at the same public institutions. DE 43 Page ID #483. This misconstrues the precedent. The comparison groups need only be "similarly situated" in all "material respect[s]." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 789-90 (6th Cir. 2005). For voting purposes, students who are eligible to vote and have a photo ID card nearly identical to non-student photo IDs issued by the same institutions are similarly situated to eligible faculty, staff and all other public college and university ID cardholders. Since the poll worker only engages in the visual and physical/tactile inspection of a photo ID unaided by any device, instrument, machine or any other technology, the two groups of voters are similarly situated in all material respects with respect to enforcing the voter ID law and

---

[16] Defendants have quoted extensively from *DeBoer v. Snyder*, 772 F.3d 388, 404-05 (6th Cir. 2014), but that decision was reversed by the Supreme Court in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

fulfilling its objectives. In light of how the voter ID law operates is actually enforced in practice, the only differences are the cosmetic ones between the ID cards those two groups of voters hold. In any event, Plaintiffs do allege that: "On information and belief, the identity verification procedures and student, faculty, and employee ID cards issued by Tennessee's private colleges and universities do not materially differ from the identity verification procedures and student, faculty, and employee ID cards used by Tennessee's public colleges and universities." DE 36 PageID #321-22 ¶ 66; *see also id*. PageID #320 ¶ 61 ("[S]tudent ID cards issued by Tennessee's public colleges and universities are nearly identical to faculty and employee ID cards issued by Tennessee's public colleges and universities in all their elements, features, functionality, and security.").

If Defendants believe there is a rational basis lurking in the application and/or pre-issuance identity verification processes for public college and university students, faculty, staff and/or other members of ID cardholders, then they need to develop that evidence. Given the right to vote is at issue here and all eligible voters are equal under the law, it is unclear what Defendants intend to convey when they state that students have a different "status" from current and retired faculty and staff at public colleges and universities in Tennessee. DE 43 PageID #483-84. Any argument as to why student and non-student (such as faculty and staff) ID cards meaningfully differ and why that constitutes a rational basis are not questions for resolution on a motion to dismiss. Plaintiffs have sufficiently alleged the two groups are "similarly situated."

Defendants contend the alleged vulnerability of student ID cards to fraudulent duplication serves as a rational basis. Plaintiffs have alleged that the "security" of public postsecondary student ID cards and other photo ID cards issued by the same institutions

do not differ.  DE 36 PageID #321 ¶¶ 64-65.  Plaintiffs go farther to allege that these IDs are physically identical except for the university affiliation designation.  *Id*. PageID #320 ¶ 61, #321 ¶ 64.  Defendants will need to prove that public college student IDs are more easily faked than their nearly identical non-student ID counterparts because all the available evidence suggests this reason provided by legislators was itself fake, pretext and ultimately irrational.  *Id*. PageID #302 ¶ 27, #306-07 ¶¶ 33-35, #325 ¶ 81.  Legislators may speculate but their "speculation" must be "rational."  *Beach Commc'ns*, 508 U.S. at 315.

Lastly, Defendants offer Rep. Jeremy Durham's argument that permitting public student ID cards from public postsecondary institutions would "impose an administrative burden on poll workers."  *Id*. PageID #484 n.6 (citing DE PageID #307 ¶ 35).  This argument has even less merit since the state already accepts non-student photo IDs from all the same public institutions and has done so since the law took effect in 2012.

## IV. CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss in full.  However, should the Court grant any portion of this Motion, especially considering the paucity of Twenty-Sixth Amendment precedent and that this will be this Court's first ruling outlining the legal standards, Plaintiffs respectfully request that the dismissal be without prejudice and with leave to file a Second Amended Complaint.

DATE: October 8, 2015

Respectfully submitted,

/s/ Jon Sherman
Jon Sherman*
Fair Elections Legal Network
1825 K St. NW, Suite 450
Washington, DC 2006

Telephone: (202)248-5346
jsherman@fairelectionsnetwork.com

*Admitted *Pro Hac Vice* to Practice in U.S. District
Court for the Middle District of Tennessee

DOUGLAS S. JOHNSTON, JR. (No. 5782)
BARRETT JOHNSTON MARTIN & GARRISON,
LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
djohnston@barrettjohnston.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 8, 2015, a copy of this *Plaintiffs' Response In Opposition To Defendants' Motion To Dismiss First Amended Complaint* has been served by Electronic Case Filing (ECF) Filing System to:

Janet M. Kleinfelter
Ryan A. Lee
Steve Hart
Public Interest Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN  37202
Tel: (615) 741-3521
Fax: (615) 532-6951
janet.kleinfelter@ag.tn.gov
ryan.lee@ag.tn.gov
steve.hart@ag.tn.gov

*Attorneys for Defendants*

                                 /s/ Douglas S. Johnston, Jr.
                                 DOUGLAS S. JOHNSTON, JR. (No. 5782)
                                 BARRETT JOHNSTON MARTIN & GARRISON, LLC
                                 Bank of America Plaza
                                 414 Union Street, Suite 900
                                 Nashville, TN 37219
                                 Telephone: (615) 244-2202
                                 Facsimile: (615) 252-3798
                                 djohnston@barrettjohnston.com